**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JASON CARON, individually and on behalf of all others similarly situated,<br><br><br>　　　　　　　　Plaintiff,<br>　　　v.<br><br>KNORR-BREMSE AG; KNORR BRAKE COMPANY LLC; NEW YORK AIR BRAKE LLC; WESTINGHOUSE AIR BRAKE TECHNOLOGIES CORPORATION; and FAIVELEY TRANSPORT NORTH AMERICA, INC.<br><br>　　　　　　　　Defendants. | Docket No. |

## CLASS ACTION COMPLAINT

Plaintiff, Jason Caron, brings this action on his own behalf and on behalf of all others similarly situated, to recover treble damages and other appropriate relief against Defendants Knorr-Bremse AG; Knorr Brake Company, LLC; New York Air Brake LLC; Westinghouse Air Brake Technologies Corporation; and Faiveley Transport North America, Inc. (collectively, "Defendants"). In support of this Class Action Complaint, Plaintiff alleges, with knowledge as to his own acts and upon information and belief as to all other matters, as follows:

### INTRODUCTION

1.     This class action challenges unlawful agreements between three (now two) of the world's largest rail equipment suppliers to restrain competition in the labor markets in which they compete for employees. Defendants' unlawful agreements included promises and commitments not to solicit, recruit, hire without prior approval, or otherwise compete for employees (collectively, "no-poach agreements"). The no-poach agreements, which were

undertaken without the knowledge or consent of their employees, were not reasonably necessary to any separate, legitimate business transaction or collaboration between the companies.

2.      With their respective subsidiaries, Defendants Knorr-Bremse AG ("Knorr") and Westinghouse Air Brake Technologies Corporation ("Wabtec"), are each other's top competitors for rail equipment used in freight and passenger rail applications. They compete with each other to attract, hire, and retain various employees, including rail equipment industry project managers, engineers, sales executives, business unit heads, and corporate officers. Prior to its acquisition by Wabtec in November 2016, Faiveley Transport S.A. and certain subsidiaries ("Faiveley") also competed with Knorr and Wabtec to attract, hire, and retain employees.

3.      Beginning no later than 2009, senior executives at Knorr and Wabtec, including executives at several of their U.S. subsidiaries, entered into no-poach agreements with each other. Beginning no later than 2011, senior executives at certain U.S. subsidiaries of Knorr and Faiveley entered into no-poach agreements with each other. And beginning no later than January 2014, senior executives at the U.S. passenger rail businesses of Wabtec and Faiveley entered into no-poach agreements with each other.

4.      The no-poach agreements spanned several years and were monitored and enforced by high- level company executives, and had the effect of unlawfully allocating employees between the companies, resulting in harm to Plaintiff and the Class.

5.      Knorr and Wabtec entered into these illegal agreements and oversaw the implementation of these agreements at their U.S. subsidiaries.

6.      By implementing these unlawful agreements, Knorr and Wabtec (including Faiveley) substantially reduced competition for employees to the detriment of rail-equipment industry workers in this important U.S. industry. These no-poach agreements denied American

rail-equipment industry workers access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment, including higher pay. Moreover, these no-poach agreements disrupted the efficient allocation of labor that comes from Knorr, Wabtec, and Faiveley vigorously competing for rail-equipment industry employees.

7.     In *per se* violation of the antitrust laws, the leaders and most senior executives of Knorr and Wabtec secretly agreed to work together to deprive thousands of their employees— American rail-equipment industry workers—of better compensation and deny them opportunities to advance their careers at other companies. These employees include workers in the rail and freight industries, especially project managers, engineers, sales executives, and corporate officers of these companies.

8.     On April 3, 2018, the Antitrust Division of the United States Department of Justice (the "DOJ") announced that it had filed a civil antitrust lawsuit against Knorr and Wabtec charging them with unlawfully agreeing to restrain competition in the labor markets in which they compete for employees, a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.  The DOJ simultaneously announced that it had reached a settlement with Knorr and Wabtec, that if approved by the court, would resolve its civil antitrust suit.  The DOJ discovered Defendants' unlawful agreements not to compete for each other's employees while investigating Wabtec's acquisition of Faiveley, which was announced in July 2015 and closed in November 2016.

9.     In filing suit, Assistant Attorney General Makan Delrahim of the DOJ explained that "the unlawful no-poach agreements challenged today restrained competition for employees

and deprived rail industry workers of important opportunities, information, and the ability to obtain better terms of employment."

10.     As the DOJ also explained, it is well established that naked restraints of competition among horizontal competitors, such as price-fixing or market allocation agreements, are *per se* unlawful.  Market allocation agreements cannot be distinguished from one another based solely on whether they involve input or output markets and labor markets are no different than other input markets under antitrust law.

11.     The DOJ confirmed that it will not seek to compensate employees who were injured by Defendants' agreements. Without this class action, Plaintiff and the Class will not receive compensation for their injuries, and Defendants will continue to retain the benefits of their unlawful collusion.

### JURISDICTION AND VENUE

12.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other Class members have suffered from Defendants' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

14.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their substantial contacts with the State of Pennsylvania, including contacts in furtherance of the conspiracy alleged herein.

15.     Defendants, directly or through their agents, subsidiaries, affiliates, or parents may be found in and transact business in the forum state.

16.     Defendants, directly or through their agents, engage in interstate commerce in the production, distribution, and sale of rail equipment and services related thereto in the United States.

17.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

## THE PARTIES

18.     Plaintiff, Jason Caron, is a resident of Glenolden, Pennsylvania.  Plaintiff worked for Faiveley, prior to and after its acquisition by Wabtec, during the Class Period.  As a result of the conspiracy as alleged herein, Mr. Caron earned less than he would have absent the alleged conspiracy.

19.     Defendant Knorr-Bremse AG ("Knorr AG") is a privately owned German company with its headquarters in Munich, Germany. Knorr is a global leader in the development, manufacture, and sale of rail and commercial vehicle equipment. In 2017, Knorr had annual revenues of approximately $7.7 billion.

20.     Defendant Knorr Brake Company LLC ("KBC") is a Delaware corporation with its headquarters in Westminster, Maryland, and is a wholly owned subsidiary of Defendant Knorr-Bremse AG. It manufactures train control, braking, and door equipment used on passenger rail vehicles. KBC is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

21.     Defendant New York Air Brake LLC ("NYAB") is a Delaware corporation with its headquarters in Watertown, New York, and is a wholly owned subsidiary of Knorr-Bremse AG. It manufactures railway air brakes and other rail equipment used on freight trains. NYAB is

registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

22.     Defendants Knorr AG, KBC, NYAB and their respective subsidiaries are collective referred to herein as "Knorr."

23.     Defendant Westinghouse Air Brake Technologies Corporation ("Wabtec") is a Delaware corporation with its headquarters in Wilmerding, Pennsylvania—located in Alleghany County, Pennsylvania. Wabtec is a publicly held company, listed on the New York Stock Exchange. With over 100 subsidiaries globally, Wabtec is the world's largest provider of rail equipment and services with global sales of $3.9 billion in 2017. It is an industry leader in the freight and passenger rail segments of the rail-equipment industry. Wabtec Passenger Transit is a business unit of Wabtec that develops, manufactures, and sells rail equipment and services for passenger rail applications. It is based in Spartanburg, South Carolina.

24.     Defendant Faiveley Transport North America, Inc., formerly a subsidiary of Faiveley Transport S.A., is now a wholly owned subsidiary of Wabtec, and is a New York corporation headquartered in Greenville, South Carolina. On or about November 30, 2016, Wabtec acquired majority ownership of Faiveley, which had been a French société anonyme based in Gennevilliers, France. Wabtec acquired 100% of the share capital and voting rights of Faiveley on or about March 21, 2017.  Prior to the acquisition, Faiveley was the world's third-largest rail equipment supplier behind Wabtec and Knorr. Faiveley had employees in 24 countries, including at six U.S. locations. It developed, manufactured, and sold passenger and freight rail equipment to customers in Europe, Asia, and North America, including the United States, with revenues of approximately €1.2 billion in 2016. In the United States, Faiveley conducted business primarily through Defendant Faiveley Transport North America. Various

Faiveley recruiting activities conducted prior to its acquisition by Wabtec are at issue in this complaint.

## CLASS ACTION ALLEGATIONS

25.      Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class of plaintiffs (the "Class") consisting of:

> All natural persons employed by Defendants or their wholly owned subsidiaries at any time from 2009 to the present (the "Class Period").

Excluded from the Class are senior executives and personnel in the human resources and recruiting departments of the Defendants, and employees hired outside of the United States to work outside of the United States. The "United States" includes all fifty states, the District of Columbia, and all U.S. territories.

26.      The Class is so numerous that joinder of all members is impracticable. The Class contains hundreds, if not thousands, of members, as each Defendant employed hundreds or thousands of Class members each year.

27.      The Class is ascertainable from Defendants' records and/or through self-identification in the claims process.

28.      Plaintiff's claims are typical of the claims of the Class because they arise out of the same course of conduct and the same legal theories, they challenge Defendants' conduct with respect to the Class as a whole, and Plaintiff and all Class members share the same injury, as they were all damaged by the actions of Defendants.

29.      There are questions of law or fact common to the Class, which predominate over any questions that may affect individual members of the Class, including:

        a.      Whether Defendants agreed not to solicit each other's employees;

> b.     Whether Defendants exchanged competitively sensitive wage information and agreed upon compensation ranges for positions held by Class members;
>
> c.     Whether such agreements were *per se* violations of the Sherman Act;
>
> d.     Whether Defendants fraudulently concealed their conduct;
>
> e.     Whether and the extent to which Defendants' conduct suppressed compensation below competitive levels;
>
> f.     Whether Plaintiff and the other Class members suffered injury as a result of Defendants' agreements;
>
> g.     Whether any such injury constitutes antitrust injury;
>
> h.     The nature and scope of injunctive relief necessary to restore a competitive market; and
>
> i.     The measure of damages suffered by Plaintiff and the Class.

30.     Plaintiff will fairly and adequately protect the interests of the class because Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members.

31.     Plaintiff is represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

32.     Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing

incompatible standards of conduct for Defendants. This action presents no difficulties in management that would preclude its maintenance as a class action.

33.     Injunctive relief is appropriate with respect to the Class as a whole because Defendants have acted on grounds generally applicable to the Class.

## FACTUAL ALLEGATIONS

### I.     The Market For Rail Equipment Employees

34.     During the Class Period, Defendants and their subsidiaries employed Class members throughout the United States, including this judicial district.

35.     Defendants' anticompetitive conduct substantially affected interstate commerce throughout the United States and caused antitrust injury throughout the United States.

36.     Defendants Knorr and Wabtec (which now includes Faiveley) are the world's largest rail equipment suppliers and each other's top rival in the development, manufacture, and sale of equipment used in freight and passenger rail applications.

37.     As of December 31, 2017, Wabtec employed approximately 18,000 full-time employees worldwide, and acquired approximately 5,700 employees in 24 countries from its acquisition of Faiveley.

38.     As of December 31, 2017, Knorr employed nearly 28,000 employees in 30 countries.

39.     The U.S. railroad equipment manufacturing industry is highly concentrated, with the 50 largest companies, including Defendants Knorr and Wabtec, accounting for more than 95% of industry revenue. Imported railroad equipment represents only about 5% of the U.S. railroad equipment market.

40.     Defendants and their subsidiaries also compete with one another and with firms at other tiers of the rail-equipment industry supply chain to attract, hire, and retain employees by offering attractive salaries, benefits, training, advancement opportunities, and other favorable terms of employment.

41.     There is high demand for and limited supply of employees who have rail-equipment industry experience. As a result, firms in the rail-equipment industry can experience vacancies of critical roles for months while they try to recruit and hire an individual with the requisite skills, training, and experience for a job opening. Employees of other rail-equipment industry participants, including the employees of each Defendant's customers, competitors, and suppliers, are key sources of potential talent to fill these openings.

42.     Firms in the rail-equipment industry employ a variety of recruiting techniques, including using internal and external recruiters to identify, solicit, recruit, and otherwise help hire potential employees. Rail companies also receive direct applications from individuals interested in potential employment opportunities. Directly soliciting employees from another rail-equipment industry participant is a particularly efficient and effective method of competing for qualified employees.

43.     Soliciting involves communicating directly—whether by phone, e-mail, social and electronic networking, or in person—with another firm's employee who has not otherwise applied for a job opening. Such direct solicitation can be performed by individuals of the company seeking to fill the position or by outside recruiters retained to identify potential employees on the company's behalf.

44.     The rail-equipment industry is an insular one in which employees at different firms form long-term relationships and often look to their professional networks to fill a vacancy.

In addition, firms in the rail-equipment industry rely on direct solicitation of employees or other rail companies because those individuals have the specialized skills necessary and may be unresponsive to other methods of recruiting.

45.     Such solicitation, often called "cold calling," is a key competitive tool in a properly functioning labor market. Cold calling includes communicating directly in any manner (including orally, in writing, telephonically, or electronically) with another firm's employee who has not otherwise applied for a job opening. Cold calling is a particularly effective recruiting method because current employees of other companies are often unresponsive to other recruiting strategies.

46.     Compared to unemployed workers or employees actively seeking new employment, employees who are not actively seeking to change employers are more likely to be among the most sought after employees. Because they are not looking for other jobs, they are difficult to reach without active solicitation. A company searching for a new hire can save costs and avoid risks by poaching that employee from a rival company.

47.     Through poaching, a company is able to take advantage of the efforts its rival has expended in soliciting, interviewing, and training employees, while simultaneously inflicting a cost on the rival by removing an employee on whom the rival may depend. Thus, if each Defendant was truly acting in its own independent self-interest, it would solicit the others' employees, including through offers of increased employment benefits and pay.

48.     The practice of cold calling has a significant impact on employee compensation in many ways. First, without receiving cold calls from rival companies, current employees lack information regarding potential pay packages and lack leverage over their employers in negotiating pay increases. When a current employee receives a cold call from a rival company

with an offer that exceeds her current compensation, the current employee may either accept that offer and move from one employer to another, or use the offer to negotiate increased compensation from her current employer. In either scenario, the recipient of the cold call has an opportunity to use competition among potential employers to increase her compensation and mobility.

49.     Second, once an employee receives information regarding potential compensation from rival employers through a cold call, that employee is likely to inform other employees of her current employer. These other employees often use the information themselves to negotiate pay increases or move from one employer to another, despite the fact that they themselves did not receive a cold call.

50.     Third, cold calling a rival's employees provides information to the cold caller regarding the compensation practices of its employer's rival. Increased information and transparency regarding compensation levels tends to increase compensation across all current employees, because there is pressure to match or exceed the highest compensation package offered by rival employers in order to remain competitive.

51.     Fourth, cold calling is a significant factor in losing employees to rivals. When a company expects that its employees will be cold called by rivals with employment offers, the company will preemptively increase the compensation of its employees in order to reduce the risk that its rivals will be able to poach otherwise undercompensated employees.

52.     The compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or the particular individuals who would have received cold calls but for the anticompetitive agreements alleged herein. Instead, the effects of cold calling

(and the effects of eliminating cold calling, pursuant to agreement) commonly impact all salaried employees of the participating companies.

53.     In a competitive labor market, rail-equipment industry employers compete with one another to attract employees. This competition benefits employees because it increases the available job opportunities that employees learn about. It also improves an employee's ability to negotiate for a better salary and other terms of employment. Defendants' no-poach agreements, however, restrained competition for employees and disrupted the normal bargaining and price-setting mechanisms that apply in the labor market.

54.     For example, while each Defendant sometimes engages in negotiations regarding compensation levels with individual employees, these negotiations occur from a starting point of the pre-existing and pre-determined baseline compensation level. The eventual compensation any particular employee receives is either entirely determined by the baseline level, or is profoundly influenced by it. In either case, suppression of baseline compensation will result in suppression of total compensation.

55.     Thus, in a properly functioning and lawfully competitive labor market, each Defendant would compete for employees by soliciting current employees of one or more of the other Defendants through cold calling. In a competitive and lawful market, Defendants would use cold calling as one of their most important tools for recruiting and retaining employees. The use of cold calling among Defendants commonly impacts and increases total compensation and mobility of all Defendants' employees.

56.     Defendants' scheme to restrain competition also included notifying each other when an employee of one Defendant applied for a position with another Defendant, and agreeing to limit counteroffers in such situations. In these circumstances, when an employee at one

13

Defendant contacted a second Defendant, the second Defendant would typically (a) notify the first Defendant and (b) not consider the applicant without permission of the other Defendant. Again, if Defendants were acting in their independent self-interest, they would not preemptively tell their competitors that they were offering jobs to the competitor's employees or refuse to bid against their competitors.

## II.    The Conspiracy

57.    As part of the conspiracy alleged herein, over a period spanning several years, Defendants Wabtec, Knorr, and Faiveley entered into similar no-poach agreements with each other to eliminate competition between them (including between their subsidiaries) for employees. Defendants conspired to suppress the compensation paid to their workers and other Class members by entering into a scheme not to solicit each other's employees, which restricted competition for U.S. rail equipment workers, limited their access to better job opportunities, restricted their mobility, and deprived them of competitively significant information that they could have used to negotiate for better terms of employment.  These agreements were executed and enforced by senior company executives and implemented throughout their U.S. subsidiaries and were not reasonably necessary to any separate, legitimate business transaction or legitimate collaboration between the companies.

### A.    The Wabtec-Knorr Agreement

58.    Wabtec and Knorr entered into pervasive no-poach agreements that spanned multiple business units and jurisdictions. Senior executives at the companies' global headquarters and their respective U.S. passenger and freight rail businesses entered into no-poach agreements that involved promises and commitments not to solicit or hire each other's employees. These no-poach agreements primarily affected recruiting for project management, engineering, sales, and corporate officer roles and restricted each company from soliciting

current employees from the other's company. At times, these agreements were operationalized as agreements not to hire current employees from one another without prior approval.

59. Beginning no later than 2009, Wabtec's and KBC's most senior executives entered into an express no-poach agreement and then actively managed that agreement through direct communications. For example, in a letter dated January 28, 2009, a director of KBC wrote to a senior executive at Wabtec's headquarters, "[Y]ou and I both agreed that our practice of not targeting each other's personnel is a prudent case for both companies. As you so accurately put it, 'we compete in the market.'" This agreement was well-known to senior executives at the parent companies, including top Knorr executives in Germany, who were included in key communications about the no-poach agreement. In furtherance of their agreement, Wabtec and KBC informed their outside recruiters not to solicit employees from the other company.

60. In some instances, Wabtec and KBC's no-poach agreement foreclosed the consideration of an unsolicited applicant employed by Wabtec or KBC without prior approval of the other firm. For example, in a 2010 internal communication, a senior executive at KBC stated that he would not even consider a Wabtec candidate who applied to KBC without the permission of his counterpart at Wabtec.

61. Wabtec and Knorr's no-poach agreements also reached the companies' U.S. rail-equipment businesses. In July 2012, for example, a senior executive at NYAB informed a human resources manager that he could not consider a Wabtec employee for a job opening due to the no-poach agreement between Wabtec and Knorr.

62. Wabtec's and Knorr's senior executives actively policed potential breaches of their companies' no-poach agreements and directly communicated with each other to ensure adherence to the agreements. For example, in February 2016, a member of Knorr's executive

board complained directly to an executive officer at Wabtec regarding an external recruiter who had solicited a KBC employee for an opening at Wabtec. The Wabtec executive investigated the matter internally and reported back to Knorr that Wabtec's outside recruiter was responsible for the contact and that he had instructed the recruiter to terminate his activities with the candidate and refrain from soliciting Knorr employees going forward due to the existing no-poach agreement between the companies.

      **B.**      **The Knorr-Faiveley Agreement**

63.      Beginning no later than 2011, senior executives at KBC and Faiveley Transport North America reached an express no-poach agreement that involved promises and commitments to contact one another before pursuing an employee of the other company. In October 2011, a senior executive at KBC explained in an e-mail to a high-level executive at Knorr-Bremse AG that he had a discussion with an executive at Faiveley's U.S. subsidiary that "resulted in an agreement between us that we do not poach each other's employees. We agreed to talk if there was one trying to get a job[.]" Executives at KBC and Faiveley's U.S. subsidiary actively managed the agreement through direct communications with each other.

64.      In or about 2012, a senior executive at KBC discussed the companies' no-poach agreement with an executive at Faiveley Transport North America. This discussion took place at a trade show in Berlin, Germany. Subsequently, the executives enforced the no-poach agreement through direct communications with each other. This no-poach agreement was known to other senior executives at the companies, who directly communicated with each other to ensure adherence to the agreement. For example, in October 2012, executives at Faiveley Transport North America stated in an internal communication that they were required to contact KBC before hiring a U.S. train brake engineer.

65. After Wabtec announced its proposed acquisition of Faiveley in July 2015, a high-level Knorr executive directed the company's recruiters in the United States and other jurisdictions to raid Faiveley for high-potential employees, temporarily "cheating" on the no-poach agreement.

### C.  The Wabtec-Faiveley Agreement

66. Beginning no later than January 2014, senior executives at Wabtec Passenger Transit and Faiveley Transport North America entered into a no-poach agreement in which the companies agreed not to hire each other's employees without prior notification to and approval from the other company.

67. Wabtec Passenger Transit and Faiveley Transport North America executives actively managed and enforced their agreement with each other through direct communications. For example, in January 2014, Wabtec Passenger Transit executives refused to engage in hiring discussions with a U.S.-based project manager at Faiveley Transport North America without first getting permission from Faiveley Transport North America executives. In an internal e-mail to his colleagues, a Wabtec Passenger Transit executive explained that the candidate "is a good guy, but I don't want to violate my own agreement with [Faiveley Transport North America]." Only after receiving permission from Faiveley Transport North America did Wabtec Passenger Transit hire the project manager. One month later, Wabtec Passenger Transit senior executive informed his staff that hiring Faiveley Transport North America's employees was "off the table" due to the agreement with Faiveley Transport North America not to engage in hiring discussions with each other's employees without the other's prior approval.

68. In July 2015, Wabtec and Faiveley publicly announced their intent to merge. Wabtec closed its acquisition of Faiveley on November 30, 2016. Presently, Faiveley is a wholly-owned subsidiary of Wabtec.

III.     **The Investigation by the Antitrust Division of the United States Department of Justice**

69.     In October 2016, the DOJ and the Federal Trade Commission (the "FTC") jointly issued the Antitrust Guidance for Human Resource Professionals (the "Antitrust HR Guidance"), which acknowledged that the DOJ intended "to proceed criminally against naked wage-fixing or no-poaching agreements," explaining that such "agreements eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers, which have traditionally been criminally investigated and prosecuted as hardcore cartel conduct."  In announcing the policy and issuing the guidance, Acting Assistant Attorney General Renata Hesse explained that "[a]ntitrust violations in the employment arena can greatly harm employees and impact earnings over the course of their entire careers."  Similarly, FTC Chairwoman Edith Ramirez stated that "Competition is essential to well-functioning markets, and job markets are no exception."

70.     At a speech delivered at the Global Antitrust Enforcement Symposium in September 2017, Acting Assistant Attorney General Andrew Finch emphasized that "that naked agreements among employers not to recruit certain employees, or not to compete on employee compensation" as an "area in which application of the *per se* rule has received attention recently."  In doing so, he told the audience that "Your clients should be on notice that a business across the street from them—or, for that matter, across the country—might not be a competitor in the sale of any product or service, but it might still be a competitor for certain types of employees such that a naked no-poaching agreement, or wage-fixing agreement, between them would receive *per se* condemnation."

71.     On January 19, 2018, the head of the Antitrust Division of the DOJ, Assistant Attorney General ("AAG") Makan Delrahim, announced that the DOJ would bring its first

18

criminal cases involving alleged no-poaching agreements in violation of the Sherman Act in the

coming months, stating that "In the coming couple of months you will see some announcements,

and to be honest with you, I've been shocked about how many of these there are, but they're

real." The AAG warned that if such activity "has not been stopped and continued from the time

when the DOJ's [new antipoaching] policy was made" in October 2016, the DOJ would "treat

that [conduct] as criminal."

72.     Following through on the AAG's statements and as "part of a broader

investigation by the Antitrust Division into naked agreements not to compete for employees," on

April 3, 2018, the DOJ filed a complaint in federal court against Defendants Knorr and Wabtec

after discovering that the companies "had for years maintained unlawful agreements not to

compete with each other's employees."

73.     The DOJ first detected the no-poach agreements during its earlier review of

Wabtec's acquisition of Faiveley.  The DOJ then launched a separate investigation into

Defendants Knorr-Bremse AG, including Faiveley Transport S.A., and Westinghouse Air Brake

Corporation, pursuant to which the DOJ found the companies' agreements unlawfully allocated

employees between the companies and were *per se* illegal under the Sherman Act. The DOJ

concluded that Defendants' agreements "disrupted the normal bargaining and price-setting

mechanisms that apply in the labor market." The DOJ also concluded that Defendants'

agreements "were naked restraints on competition for employees and were not reasonably

necessary to any separate legitimate business transaction or collaboration between the firms."

74.     Simultaneous with the announcement that it had filed suit, the DOJ also

announced that it reached a settlement with the two companies.  Under the terms of the

settlement, if approved by the court, Wabtec and Knorr are prohibited from entering,

maintaining, or enforcing no-poach agreements with any other companies going forward. The proposed stipulation and order by the DOJ covers both parent companies Wabtec and Knorr, and their successors and assigns, subsidiaries (including Faiveley Transport), divisions, groups, affiliates, partnerships, joint ventures, directors, officers, managers, agents, and employees.

75.     The DOJ noted that it "pursued the agreements at issue in the Complaint by civil action rather than as a criminal prosecution because the United States uncovered and began investigating the agreements, and the Defendants terminated them before the United States had announced its intent to proceed criminally against such agreements."

76.     As part of the DOJ's filings, it emphasized that the settlement agreement with Defendants covered a restraint on soliciting, recruiting, hiring without approval, or otherwise competing for various employees, including "project managers, engineers, executives, business unit heads, and corporate officers." This restraint deprived workers of "competitively important information that they could have leveraged to bargain for better job opportunities in terms of employment."

## HARM TO COMPETITION AND ANTITRUST INJURY

77.     Defendants' conspiracy suppressed Plaintiff's and the Class' compensation and restricted competition in the labor market in which Plaintiff and the other Class members sold their services. It did so through a scheme to limit solicitation of each other's employees and to limit compensation for their employees.

78.     Defendants' conduct intended to and did suppress compensation. Concerning the anti-solicitation scheme, cold calling and other forms of solicitation have a significant beneficial impact for individual employees' compensation. Cold calls from rival employers may include offers that exceed an employee's salary, allowing her to receive a higher salary by either changing employers or negotiating increased compensation from her current employer.

Case 2:18-cv-00504-JFC   Document 55   Filed 04/30/18   Page 21 of 28

Employees receiving cold calls may often inform other employees of the offer they received, spreading information about higher wage and salary levels that can similarly lead to movement or negotiation by those other employees with their current employer or others.

79.    Active solicitation similarly affects compensation practices by employers. A firm that solicits competitors' employees will learn whether their offered compensation is enough to attract their competitors' employees, and may increase the offer to make themselves more competitive. Similarly, companies losing or at risk of losing employees to cold-calling competitors may preemptively increase their employees' compensation in order to reduce their competitors' appeal.

80.    Information about higher salaries and benefits provided by recruiters for one firm to employees of another naturally would increase employee compensation. Restraining active recruitment made higher pay opportunities less transparent to workers and thus allowed employers to keep wages and salaries down.

81.    The compensation effects of cold calling are not limited to the particular individuals who receive cold calls, or to the particular individuals who would have received cold calls but for the anticompetitive conduct alleged herein. Instead, the effects of cold calling (and the effects of eliminating cold calling, pursuant to agreement) commonly impacted all workers and Class members employed by the Defendants.

82.    The Defendants themselves have issued statements connected to their involvement with the anti-solicitation scheme uncovered by the DOJ's investigation. A public statement issued by Knorr on April 3, 2018 indeed noted that "Knorr-Bremse has agreed to the settlement to put this matter behind it and to continue its focus on providing state-of-the-art systems, services, and integrated solutions to its customers." Similarly, Wabtec issued a

statement on April 3, 2018, stating the company settled to avoid "the cost and distraction of litigation."

## FRAUDULENT CONCEALMENT

83.     Until the DOJ's settlement with Defendants became public on April 3, 2018, Plaintiff and Class members had neither actual nor constructive knowledge of the pertinent facts constituting their claims for relief asserted herein. Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy.

## I.     Defendants Took Affirmative Steps to Mislead Class Members and Conceal the Conspiracy

84.     Defendants took many steps to conceal the conspiracy from Class members. They guarded their conspiratorial communications to keep them from coming to light, and they affirmatively misled Plaintiff and the Class as to what they did to retain or find employees. They made these misstatements in a variety of forms, including direct communications with Class members, codes of business conduct issued to Class members, and even public filings with regulatory bodies such as the Securities and Exchange Commission (the "SEC").

85.     Furthermore, as part of Wabtec's 2017 Form 10-K, filed with the SEC, Wabtec listed Knorr as its "main competitor" while reporting to shareholders that management "recognizes its responsibility for conducting the Company's affairs according to the highest standards" including conducting "its business activities within the laws of host countries in which the Company operates."  Wabtec's 2017 Form 10-K filed just weeks before the complaint and settlement agreement with the DOJ was announced makes no mention of any pending DOJ investigation.

86.     Similarly, Knorr's Code of Conduct applied to "all employees of the Knorr-Bremse Group worldwide" and expressly expected "the entire workforce not only to observe internal regulations but also to observe the law[.]"

87.     Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy among rail equipment companies to restrict competition for Class members' services through anti-solicitation agreements, and to fix the compensation of Class members. As discussed above, Defendants' discussions often occurred through direct conversations with each other's senior executives or through email exchanges between senior executives and/or recruiters, information to which Class members were not privy.

88.     Defendants' conspiracy was concealed and carried out in a manner specifically designed to avoid detection. Through outside top executives and recruiting personnel, Defendants concealed and kept secret the illicit anti-solicitation agreements from Class members. Defendants relied on non-public methods of communication in order to prevent dissemination of the conspiracy beyond the individuals involved and to avoid unnecessarily creating evidence that might alert Plaintiff or other Class members to the conspiracy's existence.

89.     Defendants' conspiracy sought to reduce competition between firms in order to suppress compensation paid to employees in the market. Thus, fundamentally, Defendants' undisclosed, unlawful conspiracy restrained natural, competitive market forces. And the result of Defendants' concerted behavior was a market with diminished competition—and compensation levels—compared to a market free from Defendants' illegal restraint. Succinctly stated, compensation was not set competitively and was instead the result of anti-competitive and illegal conduct. Defendants represented the exact opposite to Class members.

90.     Upon information and belief, to cover up their conspiracy and prevent Plaintiff and Class members from learning that their compensation was suppressed through collusion, Defendants routinely provided pretextual, incomplete, or materially false and misleading explanations for compensation decisions and recruiting and retention practices affected by the conspiracy.

## II.     Plaintiff and Class Members Lacked Actual or Constructive Knowledge of the Conspiracy During the Class Period

91.     Because of Defendants' successful deceptions and other concealment efforts described above, Class members had no reason to know Defendants had conspired to suppress compensation throughout the class period, up until April 3, 2018, when the DOJ announced it had charged Defendants with *per se* violation of the Sherman Act in connection with their no-poaching agreements and settled with them.

92.     As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## INTERSTATE COMMERCE

93.     During the Class Period, Defendants employed Plaintiff and other Class members in at least Pennsylvania, New York, South Carolina, Maryland, and Delaware. Defendants' other subsidiaries employed workers in at least Ohio, Virginia, Kentucky, Illinois, California, Texas, and Wisconsin.

94.     States compete to attract rail-equipment industry offices, leading employment in the industry to cross state lines.

95.     Labor competition in the rail and freight industry is nationwide. Defendants considered each other's wages to be competitively relevant regardless of location, and many Class members moved between states to pursue opportunities.

96.     Defendants' conduct substantially affected interstate commerce throughout the United States and caused antitrust industry throughout the United States.

## CLAIM FOR RELIEF
## VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3

97.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

98.     Defendants, by and through their officers, directors, employees, or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of 15 U.S.C. §§ 1, 3. Specifically, Defendants agreed to restrict competition for Class members' services through refraining from solicitation of each other's employees, thereby fixing the compensation ranges of Class members, all with the purpose and effect of suppressing Class members' compensation and restraining competition in the market for class members' services.

99.     Defendants' conspiracy injured Plaintiff and other Class members by lowering their compensation and depriving them of free and fair competition in the market for their services.

100.     Defendants' conspiracy is a *per se* violation of Sections 1 and 3 of the Sherman Act.

101.     Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of a Class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

a. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on certifying the Class as defined therein;

b. Appointing Plaintiff as Class Representative and his counsel as Class Counsel;

c. Ruling that the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

d. Entering judgment for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law;

e. A permanent injunction prohibiting Defendants from hereafter agreeing not to solicit other companies' employees, to notify each other of offers extended to potential hires, or not to make counteroffers, or engaging in unlawful communications regarding compensation and agreeing with other companies about compensation ranges or any other terms of employment;

f. Awarding Plaintiff and the Class their costs of the suit, including attorneys' fees, as provided by law; and

26

g. Granting such other and further relief as is just and proper under the circumstances.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: April 30, 2018                Respectfully submitted,

                                 _/s/Bruce C. Fox_____
                                   Bruce C. Fox
                                   OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                   BNY Mellon Center
                                   500 Grant Street, Suite 5240
                                   Pittsburgh, PA 15219-2502
                                   Telephone: (412) 566-1500
                                   bruce.fox@obermayer.com

                                   William J. Leonard*
                                   OBERMAYER REBMANN MAXWELL & HIPPEL LLP
                                   Centre Square West
                                   1500 Market Street, 34th Floor
                                   Philadelphia, PA  19102
                                   Telephone: (215) 665-3000
                                   william.leonard@obermayer.com

                                   Michael J. Boni*
                                   Joshua D. Snyder*
                                   John E. Sindoni*
                                   BONI, ZACK & SNYDER LLC
                                   15 St. Asaphs Road
                                   Bala Cynwyd, PA  19004
                                   Telephone: (610) 822-0200
                                   mboni@bonizack.com
                                   jsnyder@bonizack.com
                                   jsindoni@bonizack.com

Arthur Bailey*
Marco Cercone*
RUPP BAASE PFALZGRAF CUNNINGHAM LLC
111 West 2nd Street, Suite 1100
Jamestown, New York 14701
Telephone: (716) 664-2967
Bailey@ruppbaase.com>
Cercone@ruppbaase.com

*Counsel for Plaintiff and the Putative Class*
*\* Pro hac vice* application forthcoming